IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 07-cv-02440-MSK-KMT

GRYNBERG PETROLEUM CO.,

      Plaintiffs,

v.

KEN SALAZAR, Secretary of the Interior,[1]
BUREAU OF LAND MANAGEMENT, and
INTERIOR BOARD OF LAND APPEALS,

      Defendants.

---

## OPINION AND ORDER AFFIRMING AGENCY ACTION

---

**THIS MATTER** comes before the Court for resolution on the parties' dispute on the

merits, pursuant to the contents of the Administrative Record (**# 8**), the Plaintiff's Opening Brief

(**# 17**), the Defendant's response (**# 18**), the Plaintiff's reply (**# 19**), and the Defendant's sur-

reply[2] (**# 21**).

## FACTS

The facts, as demonstrated in the Administrative Record, reveal that the Plaintiff is the

owner of a natural gas well, located in the vicinity of Montrose, Colorado.  The well was drilled

---

[1]The Court has sua sponte modified the caption in this case to properly identify the current Secretary of the Interior.

[2]The Defendants neither sought nor obtained leave to file a sur-reply brief.  However, the Plaintiff has not objected to the Defendant's filing, and in the absence of such an objection, the Court deems the parties to consent to the Court's consideration of the Defendant's sur-reply brief.

in the mid-1970s, pursuant to a lease between the Plaintiff and Defendant Bureau of Land

Management ("BLM").  In 1991, the BLM observed that the well was not producing material

amounts of natural gas and demanded that the Plaintiff either produce gas from the well or plug

the well and abandon it.  In 1996, the Plaintiff filed a Notice of Intent to Abandon, requesting

permission to plug the well.  The BLM approved the request, subject to certain conditions

intended to protect nearby water supplies.  The Plaintiff objected to the BLM's conditions, and

appealed the approval to the Interior Board of Land Appeals ("IBLA").  In 2000, the IBLA

affirmed the conditions imposed by the BLM on the plugging of the well.[3]  The Plaintiff then

submitted additional proposals for plugging the well to conform to the BLM's requirements, and

on August 10, 2000, the BLM formally approved the Plaintiff's plan for plugging the well.

In November 2000, the Plaintiff wrote to the BLM to explain "why this well has not been

plugged yet."  It explained that it had attempted to retain a contractor to perform the plugging

operation, but that environmental conditions affecting access to the site and "crew and rig

shortages" made it impossible to complete the process.  The letter explained that the contractor

"has promised that as soon as the road [to the well] becomes passable in the spring, he will visit

the location and give us a bid and will plug the well shortly thereafter."  The record indicates that

the contractor was prepared to plug the well in June 2001, but the Plaintiff cancelled the effort,

instead intending commencing attempts to connect the well to a nearby pipeline.

In July 2001, the well remained unplugged, and the BLM wrote to the Plaintiff,

reminding it of its "commitment . . . to have this well plugged and abandoned early in the

---

[3]In the interim, the BLM, without protest by the Plaintiff, terminated the Plaintiff's lease
on the parcel, effectively ending the Plaintiff's entitlement to maintain the well.

Summer."  The BLM stated that it "is willing to grant [the Plaintiff] until the end of the summer to plug this well."  The Plaintiff responded by noting its hope to connect the well to a nearby pipeline, thus restoring its productive capabilities, and the Plaintiff requested "an extension for plugging or connecting the subject well for one year from September 21, 2001."  The BLM replied that the request for an extension of time to arrange a connection to a pipeline was not granted, insofar as the Plaintiff's had failed to demonstrate the likelihood of connecting to the pipeline, and that, in any event, the Plaintiff's lease to the well had been terminated.  The BLM emphasized that "this well must be plugged and abandoned by September 21, 2001."

The Plaintiff failed to meet the September 21, 2001 deadline for plugging the well, and on November 13, 2001, the BLM issued the Plaintiff an "Incident of Noncompliance" ("INC") notice.  The INC informed the Plaintiff that it was required to complete the plugging of the well by December 5, 2001, or else the BLM would issue another INC, accompanied by an assessment of penalties.  The Plaintiff again failed to meet the BLM's deadline, and on December 13, 2001, the BLM issued a second INC and an assessment of $ 250 against the Plaintiff, pursuant to 43 C.F.R. § 3163.1(a)(2).  The second INC gave the Plaintiff until January 8, 2002 to complete the plugging of the well, or to risk being subjected to civil penalties under 43 C.F.R. § 3163.2.  The record does not reveal any response by the Plaintiff to these INCs.

On January 22, 2002, the BLM wrote to the Plaintiff, noting that the requirement that the well be plugged had still not been complied with, and thus, the BLM stated that it was imposing civil penalties on the Plaintiff pursuant to 43 C.F.R. § 3163.2(g)(2)(iii), in the amount of: $50 per day, retroactively, from December 19, 2001 to January 28, 2002; and (ii) $ 500 per day between January 28 and February 17, 2002, after which the BLM would arrange to have the well plugged

3

at the Plaintiff's expense.[4]  On February 5, 2002, the Plaintiff invoked its right to appeal the imposition of civil penalties to a BLM hearing officer.[5]

The BLM hearing officer heard the appeal in November 2003.  At that hearing, the Plaintiff's position (as reflected in its closing argument) was that the BLM "gave no consideration at all to what were probably the most relevant factors to determine whether there was a reasonable abatement period" for the violation – namely, "weather factors" making access to the site difficult for the heavy equipment required to perform the operation and "whether there was a rig available."  The BLM hearing officer rendered a decision on August 3, 2004, finding that: (i) it was not necessary to determine who bore the burden of proving a violation, as the BLM's proof was sufficient to meet any burden it bore, and thus, the Plaintiff had the burden of showing that the BLM's decision was arbitrary and capricious or against the weight of the evidence; (ii) the BLM properly followed the procedures for imposing a civil penalty under 43 C.F.R. § 3162.2(g)(2), and thus, had not acted arbitrarily or capriciously; (iii) the Plaintiff's complaint that winter weather conditions warranted a longer abatement period were unsupported, in that the Plaintiff had not visited the well site during the winter of 2001-02, that BLM personnel visited the site twice during that winter without incident, and that portions of the well had been drilled during winter months (admittedly, by somewhat different equipment than that

---

[4]The February 17, 2002 deadline passed, and the parties agree that the total civil penalty assessed pursuant to these terms is $ 30,000.  The well was eventually plugged by the Plaintiff in May 2002.

[5]The appeal notice recited the Plaintiff's frustrations with alleged discrimination against it by the owners of the pipeline the Plaintiff wished to connect to, and proposed to establish a $40,000 escrow account to cover the cost of plugging the well by July 1, 2002.  The notice made no mention of weather concerns or the lack of available drilling rigs.

4

which would be used to plug the well); (iv) the Plaintiff's contentions that the unavailability of rigs warranted a longer abatement period was not supported by any evidence, and indeed, the evidence indicated that the Plaintiff's delay in plugging the well was the result of his attempts to connect it to the pipeline, not due to the unavailability of rigs; (v) once the BLM has set a presumptively reasonable abatement period, the burden is on the Plaintiff to request an extension, something that the Plaintiff did not do; and (vi) the amount of penalties imposed by the BLM were not rendered unreasonable by the lack of harm resulting from the failure to plug the well or the Plaintiff's alleged "good faith" in offering a bond to secure the costs of plugging the well in the future.

The Plaintiff appealed the hearing officer's decision to the IBLA, arguing that the hearing officer had misapplied the burden of proof – that is, the Plaintiff argued that the BLM bore the burden of proving that the abatement period it offered was reasonable under the circumstances (and, by extension, that the BLM was required to show that weather conditions would not prevent heavy equipment from accessing the site and that such equipment was available during the abatement period).  On August 23, 2007, the IBLA affirmed the hearing officer's decision in pertinent part,[6] finding: (i) the Plaintiff's citation to caselaw supporting its contention that the BLM had the burden of proof as to the reasonableness of the abatement period applied only where the evidence was in equipoise, and here, the BLM's evidence was more substantial than the Plaintiff's; (ii) the burden is on a producer to prove that a facially-valid abatement period is unreasonable or to show that the producer reasonably sought an extension of time to comply;

_____

[6]The IBLA found that the $ 250 (but not subsequent interest charged on that sum) assessed against the Plaintiff as part of the first INC should have been offset against the $ 30,000 penalty.

(iii) the penalties imposed took into account the minor nature of the violation.

The Plaintiff then commenced this action, asserting a single claim for relief pursuant to the Administrative Procedures Act ("APA"), 5 U.S.C. § 701 *et seq.*  As framed by the Complaint (**# 1**), the Plaintiff alleges that the IBLA's decision was arbitrary and capricious in that: (i) the IBLA improperly apportioned the burden of proof, and that the BLM bears the burden of showing both that a violation occurred and, with regard to the reasonableness of the abatement period, that "the site was accessible [and] that plugging equipment was available"; (ii) the BLM abused its discretion by imposing the maximum penalty for a minor violation; and (iii) it was an abuse of discretion by the BLM not to reduce the penalty imposed in light of the circumstances here.

## ANALYSIS

### A.  Standard of review

The APA provides that a court may review and set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(a).  Agency actions are arbitrary and capricious (or otherwise in violation of the APA), when the agency entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, is so implausible that it could not be ascribed to a difference in view or the product of agency expertise, failed to base its decision on consideration of the relevant factors, or if there has been a clear error of judgment on the agency's part.  *Wilderness Workshop v. Bureau of Land Management*, 531 F.3d 1220, 1224 (10th Cir. 2008).

### B.  Burden of proof on abatement periods

The Plaintiff's first contention is that the IBLA erred in finding that the BLM does not

bear the burden of showing that the non-compliant condition can be abated within the abatement

period that the BLM has chosen.

Before turning to the parties' arguments, it is useful to review the regulations at issue

here.  The regulatory scheme posits a three-step process by which an operator who "fails or

refuses to comply with . . . the requirements of any notice or order" is punished.  First, the BLM

is required to notify the operator of the violation or default and "set forth a reasonable abatement

period." 43 C.F.R. § 3163.1(a).  If that abatement period passes without the non-compliant

condition being corrected, the BLM may then impose a monetary "assessment," the amount of

which varies with the severity of the violation.  43 C.F.R. §3163.1(a)(i)-(ii).  Where minor

violations are involved – as is the case here – the assessment must be accompanied by "an

abatement period of not less than 20 days."  43 C.F.R. § 3163.2(g)(2)(ii).  If the condition

remains unabated after this second abatement period expires, the BLM may then begin imposing

civil penalties in accordance with 43 C.F.R. § 3163.2(g)(2)(iii).

The Plaintiff argues that the BLM's proposed abatement period here was not

"reasonable,"[7] in that the BLM never demonstrated that the Plaintiff could indeed have plugged

the well during the time period given by the BLM, due to adverse weather conditions and

---

[7]The Court assumes that, by referencing the requirement of a "reasonable abatement period," the Plaintiff is challenging the 22-day period in the first INC, ending on or about December 10, 2001.  As the recitation above notes, § 3163.1(a) requires a "reasonable abatement period" to be offered in a first notice of violation; the second INC requires simply that the abatement period be "not less than 20 days."

unavailability of rigs.  The Plaintiff's primary support for this argument is *Director v. Greenwich*

*Collieries,* 512 U.S. 267 (1994).  There, the Supreme Court addressed a dispute arising under

that portion of the APA that provides that, except where another statute directs otherwise, "the

proponent of a rule or order has the burden of proof."  5 U.S.C. § 556(d).  *Greenwich Collieries*

reached the somewhat unremarkable conclusion that "burden of proof" in the APA referred to

the burden of persuasion, rather than a burden of production.  *Id.* at 276.  In other words, the

Supreme Court explained that "when the evidence is evenly balanced," the party with the burden

of persuasion – under the APA, usually the "proponent of a rule or order" – loses.  *Id.* at 281.

The IBLA's decision properly notes that the rule in *Greenwich Collieries* takes effect

only when the evidence is "equally balanced" on both sides[8]; only where both sides' evidence is

equally persuasive does it become necessary to decide which party failed to meet its burden of

demonstrating that the preponderance of the evidence favored them.  But the rule becomes

unnecessary where one side's evidence is stronger than the other's, even by a small amount.  In

such circumstances, there is no need to resort to the burden of proof as the "tiebreaker"; rather,

the side with the more persuasive evidence is necessarily the winner.

Here, both the BLM hearing officer and the IBLA concluded that the balance of the

evidence tipped in favor of the BLM, making any discussion of the "burden of proof" irrelevant.

In reviewing that determination, this Court examines the record to determine whether the

agency's determination is supported by "substantial evidence."  5 U.S.C. § 706(2)(E).

"Substantial evidence" is "something more than a mere scintilla but something less than the

---

[8]For ease of discussion, the discussion herein assumes that the quantum of proof required
of the party with the burden is a preponderance of the evidence.

weight of the evidence . . . it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *TMJ Implants, Inc. v. U.S. Dept. of Health and Human Servs.*, 584 F.3d 1290, 1299 (10th Cir. 2009).  The agency appeared to credit testimony from the BLM that: (i) neither the Plaintiff nor the contractors it would use to plug the well had actually assessed the accessibility of the road near or during the abatement period[9]; (ii) BLM employees drove up to the well site on separate dates in both December 2001 and January 2002, and although snow was present, they had no difficulty in reaching the site[10]; (iii) equipment to drill the well in the first instance had navigated the same road in winter conditions in the 1970s; and (iv) the Plaintiff's primary expenditure of energy during this time period was not on attempting to arrange to have the well plugged, but rather, to stall the plugging of the well while it attempted to negotiate access to the pipeline.  The agency found this evidence more persuasive than evidence by the Plaintiff, provided solely through its principal, Mr. Grynberg.  Mr. Grynberg testified that "I couldn't get any of my people to go drive out there . . . it was dangerous to get in there," but neither identified nor called as witnesses his "people" who had refused to go nor otherwise explained the circumstances of their refusals.  Similarly, Mr. Grynberg testified that the contractor he intended to use for the project "refused to do it" during December 2001 and January 2002, but again, the Plaintiff did not call a representative of the contractor to attest to

---

[9]The Plaintiff's principal, Mr. Grynberg, made a reference to an individual named "McKinney" having difficulty navigating the road at some point in time, but, as best the Court can determine, Mr. McKinney was not called as a witness and thus, the circumstances of his experience are not apparent.

[10]Mr. Grynberg testified that weather conditions made the road more treacherous for lighter vehicles than it did for heavier ones, but the BLM employees negotiated the road in one of the lightest vehicle that could be expected to travel it – a four-wheel drive pickup truck.

this fact.

Although the conclusion reached by the agency may not have been the only reasonable view one could have of the evidence, it was by no means an unreasonable assessment of the record and it was a conclusion supported by substantial evidence. The BLM did not demonstrate that a specific contractor would have been willing to brave the weather and plug the well during the abatement period, but its evidence did cast doubt on the Plaintiff's contention that the road was effectively impassable during the winter. The BLM conclusively demonstrated that the road was passable by both lightweight vehicles and drilling equipment during the winter, whereas the Plaintiff's evidence that the road was too dangerous to travel was both conclusory and hearsay. Moreover, the agency took note of evidence that demonstrated that the Plaintiff's had persistently delayed efforts to plug the well, and that since July 2001, the Plaintiff's activities were dedicated towards connecting the well to the pipeline, an action that is fundamentally inconsistent with representations that the Plaintiff was making good faith efforts to plug the well promptly. Accordingly, the Court finds that the hearing agency's factual findings were supported by substantial evidence. By finding that the BLM's evidence was weightier than the Plaintiff's evidence, the question of the burden of proof was irrelevant, and established that the BLM had offered the Plaintiff a reasonable abatement period. Thus, the Plaintiff's APA challenge on this point is without merit.

**C. Reduction of penalty**

The Plaintiff contends that the hearing officer also erred by failing to find that the circumstances warranted a reduction in the penalty imposed by the BLM.

The civil penalty imposed by the BLM was the amount dictated by 43 C.F.R. §

3163.2(g)(2)(iii) (penalty "shall be at the rate" of $ 50, and later, $ 500 per day).  However, the

BLM is authorized, "on a case-by-case basis, to . . . reduce civil penalties."  43 C.F.R. §

3163.2(h).  The Plaintiff argues that the BLM abused its discretion by not reducing the penalties

imposed on it, given that there was no material harm resulting from the failure to plug the well

and because the Plaintiff offered to post funds into escrow to pay for the plugging of the well in

the future.

The hearing officer found that the lack of harm was already factored into the penalty,

insofar as the Plaintiff was issued civil penalties under § 3163.2(g)(2), which applies only to

"minor violations," instead of subsection (g)(1), which applies to "major violations."  It found

that the Plaintiff's offer of a $ 40,000 escrow account to secure the plugging of the well was

immaterial, as the Plaintiff had already been required to post a $ 150,000 bond as a condition of

its lease and that the funds embodied by that bond would have been sufficient to plug the well in

any event, making the posting of an additional bond a meaningless offer.  Finally, the hearing

officer found it unpersuasive that the remainder of the circumstances – *e.g.* the fact that the

Plaintiff had promptly paid the few minor assessments issued on previous INCs – did not warrant

a reduction in the penalty, given the lengthy record of the Plaintiff's resistance to instructions to

plug the well and its insistence upon attempting to negotiate access to the pipeline to sell gas it

was no longer entitled to extract.

The Plaintiff's argument offers nothing more than the fact that the BLM <u>could</u> have

elected to reduce the penalties, but has not shown that the facts of this case were so

overwhelmingly favorable to the Plaintiff that the Court could conclude that the BLM abused its

discretion by not doing so.  The hearing officer concluded that all of the Plaintiff's arguments in

favor of a penalty reduction were offset by equally compelling arguments to the contrary, and the Plaintiff does not meaningfully rebut the hearing officer's factual findings.  Accordingly, the Court cannot say that the BLM's refusal to reduce the penalties was an abuse of discretion.

## CONCLUSION

For the foregoing reasons, the Court finds that the Plaintiff's challenges under the APA are without merit.  The decision of the IBLA is **AFFIRMED**.  The Clerk of the Court shall enter judgment in favor of the Defendants.

Dated this 16th day of March, 2010

BY THE COURT:

Marcia S. Krieger
United States District Judge